# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| **BRANDON JEROD SMITH,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:13cv00060 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **OFFICER OWENS, et al.,** | ) | By: Pamela Meade Sargent |
| Defendants | ) | United States Magistrate Judge |

The pro se plaintiff, Brandon Jerod Smith, is a Virginia Department of Corrections, ("VDOC"), inmate formerly housed at Wallens Ridge State Prison, ("Wallens Ridge"). This case was tried to the court on September 19, 2013. On request of the plaintiff, an extension of time was granted until October 18, 2013, to allow for the filing of additional evidence by the plaintiff. The matter is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The undersigned now submits the following report and recommended disposition.

*I. Facts and Procedural Background*

Smith brings this civil rights action pursuant to 42 U.S.C. § 1983 for violation of his Eighth Amendment right to be free from cruel and unusual punishment against Officer Michael Owens, Officer Douglas Dixon and Lieutenant John Carico, VDOC officers who work, or did work, at Wallens Ridge. Smith claims that these officers physically and sexually assaulted him on November 8, 2012, in retaliation for his complaint about their use of chewing tobacco. Smith's claims were heard before the undersigned on September 19, 2013. The record

remained open through October 18, 2013, on Smith's request for the filing of additional evidence.

At trial, Smith testified that Owens and Carico pulled him from cell A-206 at Wallens Ridge at approximately 9 a.m. on November 8, 2012, to transfer him to a cell in the D Building. Smith said that, as he, Owens and Carico walked down the boulevard from the A Building to the kitchen, Carico commented that Smith's uncle, also an inmate at Wallens Ridge, hated Smith. Smith stated that as they entered the kitchen hallway, Owens grabbed Smith's hair and slammed Smith's head into the door facing without provocation. Smith stated that this caused him "excruciating" pain.

Smith testified that after they entered the vestibule of the D Building, Owens said, "Don't fucking spit on me," and began punching him in the left side of his head with both hands, causing Smith to lose his balance and fall face-down on the floor. Smith specifically testified that he did not spit on Owens. After he fell to the floor, Smith said that Owens repeatedly slammed his head into the concrete floor. Smith said that Carico spread his legs apart and kicked him in his testicles. Smith said that Owens stated that he was assaulting Smith because Smith had "wrote the senior officer up." Smith testified that Owens spit on one of his fingers and then stuck it into Smith's rectum. Smith said that Dixon then came into the vestibule and kicked him in the face and head three to four times. Smith stated that, during this assault, he was face-down on the floor with his hands restrained behind his back.

Smith testified that Dixon then picked him up and took him to his cell where he was placed in five-point restraints by other correctional officers at the direction of Carico. Smith said that Nurse Stacy Gilliam then came and evaluated him to make sure the restraints were properly applied. Smith stated that he told Gilliam that the officers had beaten him. Smith admitted that he did not tell Gilliam that Owens had sexually assaulted him. He also admitted that he told Gilliam he did not want to go to the medical department to be evaluated.

Smith testified that, as a result of this assault, his left eye was black, and the left side of his face was swollen. His also stated that his groin area was painful around his testicles.

Smith testified that Qualifed Mental Health Professional, ("QMHP"), Jones came by his cell later that day. Smith admits that he told Jones that he felt suicidal. Smith said that he also told Jones that he had been sexually assaulted. Smith testified that he spoke to Jones again the next day. Smith said that he told Jones that the officers had beaten him and that Owens had penetrated his rectum with his finger.

Smith testified that he was taken to medical at approximately 3 p.m. on November 9 and spoke to Dr. Miller. Smith stated that he told Dr. Miller what had happened the previous day. In particular, Smith testified that he told Dr. Miller that Owens had penetrated his rectum with his finger. He said he also told Dr. Miller that he did not want to talk about the incident in detail. Smith said he did this because there were correctional officers present while he was speaking with Dr. Miller.

Smith testified that he saw two different QMHPs, Dye and Wright, on the next day. Smith said that he told both of them that Owens had penetrated his rectum with his finger.

Smith testified that, as result of this assault, he has migraine headaches. He stated that he did not have migraine headaches before this assault. He stated that he takes Inderal for these headaches and that he has to pay $2 for this medication every 90 days. Smith stated that the area around his left eye remained black and blue, and his left eyeball was red for about one and a half weeks after the incident. He stated that the swelling in his face resolved in a couple of days.

Smith stated that Owens threatened to sexually assault him again on November 27, 2012. According to Smith, Owens said that he would plant a knife on Smith if Smith did not "keep that pen off them nurses." Smith testified that this was a reference to Smith previously writing a grievance against Nurse Gilliam for giving his medication to another inmate. Smith testified that Owens and Gilliam were romantically involved and had a child together. Smith also stated that Owens asked him, "You want me to put my finger in your ass again?"

On cross-examination, Smith admitted that he was charged with and convicted of spitting on Owens on November 8, 2012. He stated that he received a 30-day sentence in disciplinary segregation as a result. Defense Exhibit No. 1, A Disciplinary Offense Report, (Docket Item No. 46-1), affirms this charge, conviction and sentence.

Owens testified that he was assigned on November 8, 2012, to move about 20 inmates from cells in the A Building to cells in the D Building at Wallens Ridge. Owens stated that he had had no contact with Smith prior to November 8 when he and Carico were assigned to move him to a new cell in the D Building. Owens stated that he did not hear any statement made about Smith's uncle as they walked through the prison yard from the A Building to the D Building. Owens stated that, when they escorted Smith through the gate into the D Building, Smith became verbally disruptive and was squirming with his arms a little. Owens stated that he used a "keylock" procedure to apply pressure to Smith's wrist, and Smith settled down. Owens testified that, as they went through the door into the vestibule of the D Building, Smith pulled away and spit on Owens's left shoulder. Owens stated that he and Carico pushed Smith forward to the ground. Owens stated that he did not hit or kick Smith. He also stated that he did not put his finger in Smith's rectum. He stated that Carico did not hit or strike Smith. Owens stated that, pursuant to prison procedures, after a use of force, other officers then relieved him and Carico. Owens stated that Dixon and, maybe, Correctional Officer Kimberlin relieved them. He stated that he did not see Dixon kick Smith. Owens stated that he did not see any visible signs of injury on Smith, but he was not present when the officers stood Smith up.

Owens stated that when an incident such as this happens, the officer must report the incident to the watch commander, may go to medical to be treated, if necessary, and then is sent to change into a clean uniform. Owens stated that Defense Exhibit No. 4 was the Incident Report he completed related to Smith spitting on him on November 8, 2012. According to this Incident Report:

> On November 8th at approximately 9:30 a.m. I officer M. Owens along with Lt. J. Carico was escorting offender B Smith #1410513 from A-206 to D-5 pod. As the offender was being escorted he became verbally disruptive so I applied the key lock escorting technique. As we entered the vestibule of D-4, 5, 6 the offender pulled away and intentionally turned and spit on my left shoulder. Myself and Lt Carico had to place the offender on the ground to regain control of the offender. Lt. Carico and I [were] then relieved by c/o Dixon and c/o Kimberlin of escorting duties. I went to the medical department and was evaluated and given a change of clothes.

(Docket Item No. 46-3.)

Owens testified that he is now married to Nurse Gilliam. He stated that he and Gilliam were not married on November 8, 2012, and that he did not then know of any complaints that Smith might have filed against Gilliam.

Lt. Carico also testified that he was assisting in the transfer of 20 or more prisoners from cells in the A Building to cells in the D Building on November 8, 2012. Carico stated that Smith presented no problem when he came out of the cell. When they got to the D Building yard, Carico said that Smith commented that he thought he was going to be classified as a level S inmate. When Carico told him that he was not, Smith became disruptive and said that he did not want to transfer to the D Building. Carico said that he told Smith that he did not have any choice. Carico testified that, after entering the D Building, Smith stopped, turned and spit on Owens's left shoulder. Carico stated that he and Owens placed Smith on the ground, and Smith became compliant. Carico stated that he and Owens held Smith on the ground until other officers arrived to relieve them. Carico stated that, during this time, he was standing over Owens and Owens was down on top of Smith.

Carico testified that Owens never hit or kicked Smith and that Smith's pants were not removed. Carico stated that he did not hit or kick Smith. Carico stated that he had no reason to believe that Smith was injured in the incident. Carico stated that Dixon then relieved them. Carico said that Dixon did not kick Smith. Carico testified that he learned of the allegation of sexual assault "months later."

Dixon testified that he was notified to report to the D Building vestibule by the control room operator on the morning of November 8, where he found Smith face-down on the ground. Dixon stated that Owens and Carico were not agitated or upset when he arrived. He stated that he stood Smith up and escorted him to a cell. Dixon stated that there was nothing unusual about the incident and that Smith was not resistant when he escorted him to a cell. Dixon stated that he saw no injuries on Smith. Dixon stated that he removed Smith's restraints and secured his cell door. He specifically testified that he did not kick Smith. Dixon testified that he did not recall if someone from medical was called to examine Smith.

Marsha Stanford, a registered nurse at Wallens Ridge, testified as to the contents of Smith's prison medical treatment record. Stanford testified that the records showed that Nurse Kendrick examined Smith in the D-5 pod at 9:55 a.m. on November 8, 2012. Kendrick's note stated that Smith voiced no complaints and said, "I'm fine." Kendrick noted no visible signs of injury. The note reflects that Smith refused Kendrick's request to take his vital signs. The inmate was placed in five-point restraints and checked by Kendrick.

Stanford testified that the medical records reflect that Smith was let out of restraints to eat and receive his medicine at 4 p.m. on November 8. When he was

placed back in restraints, Nurse Stanley examined him. She noted that Smith voiced no complaints. The records also reflect that Smith had no complaints when he was let out of restraints at 7:10 a.m. on November 9 to take his medications. When he was let up at 9:50 a.m. that morning, it was again noted that he voiced no complaints. The nurse also noted no signs of discomfort or injury. The record reflects that Smith was released from five-point restraints at 2:25 p.m. on November 9. Smith told the nurse that he had been beaten by officers and sexually assaulted, but he did not want to talk about it. The note reflects "very minimal, if any" swelling or discoloration of left eye.

Dr. Daniel J. Miller testified that he was the institutional physician at Wallens Ridge on November 9, 2012. Dr. Miller stated that he was an independent contractor and not a VDOC employee. Dr. Miller stated that he saw Smith on the afternoon of November 9, 2012. Dr. Miller stated that he noted very minimal swelling and discoloration above Smith's left eye. In particular, Dr. Miller testified that Smith did not have a black eye. Dr. Miller stated that Smith did not complain of any other injury or pain and that Smith told him that he did not want to talk about what had happened to him.

Dr. Miller testified that he saw Smith again on November 14, 2012, when Smith complained of blood in his urine after starting a hunger strike. Dr. Miller stated that Smith did not mention any assault to him on this occasion. Dr. Miller stated that Smith was refusing to eat because he claimed that officers were tampering with his food. Dr. Miller stated that he diagnosed Smith as suffering from epididymitis, a painful inflammation most likely caused by an infection. Dr. Miller said that on November 16, 2012, Smith reported no further blood in his

urine. On this occasion, Smith reported that he was suffering from a different kind of pain which he had suffered for a long time due to multiple chlamydia infections.

Wallens Ridge Investigator Michael McBride testified that he had reviewed all Wallens Ridge's relevant video recordings to determine if the recordings would support Smith's claims. McBride stated that, while there was one camera facing the kitchen door, there was no camera that recorded video of the kitchen hallway. McBride testified that Defendant's Exhibit No. 3 were the video recordings that he had compiled of Smith being escorted by Owens and Carico down the A Building boulevard to the kitchen and on to the D Building and of the D building vestibule door. McBride stated that he saw nothing unusual on the video recordings.

McBride testified that the video recording of the D Building vestibule door shows that Smith was escorted into the vestibule prior to 9:44:12 a.m., when the vestibule door closes. McBride stated that the prison's vestibule doors are shut any time there is any incident with an inmate in the vestibule. The video shows by 9:47:10 a.m., the vestibule door was reopened and Smith was on his feet, and by 9:47:17 a.m., Sergeant Fannon and two other officers were escorting Smith into the building. McBride stated that any time an ROSP inmate is placed in restraints, pictures are taken of the inmate. He testified that Defense Exhibit #2 contains these pictures.

McBride said that he did not learn of Smith's allegation that he was sexually assaulted until the next afternoon when Jones sent an email to him. McBride stated that he then had Smith taken to the medical department to be examined.

Inmate Stacy Newbill testified that he was in the same housing unit with Smith at Wallens Ridge in December 2012. Newbill stated that he was transferred to a cell in the same pod with Smith at some point in December 2012. Newbill first testified that he was held in cell B-422, and Smith was held in cell B-402. Newbill later testified that he was held in cell D-422, and Smith was held in cell D-402. Newbill stated that he heard Owens, Dixon and Correctional Officer Stidham constantly threatening Smith in December 2012. Newbill testified that he heard them tell Smith that, if he did not drop the "paperwork," they were going to assault him again. Newbill stated that he heard Owens tell Smith, "I am going to break you." Newbill said that he filed more than 10 request forms to Unit Manager Sweeney, Warden Holloway and Investigator McBride complaining that Owens, Dixon and Stidham were abusing and threatening Smith. Newbill stated that under the VDOC policies, he was supposed to receive a response to these request forms within 15 days. He stated that he never received a response to any of these request forms. Newbill stated that he was in the same pod as Smith for about a month, and then Smith was moved from the pod.

Richard Saylor, a Psychological Assistant Senior with the VDOC, testified based on his review of Smith's VDOC mental health records. Saylor stated that, prior to November 8, 2012, Smith had a psychological diagnosis of post-traumatic stress disorder, for which he was taking Effexor XR and generic Paxil. Saylor also testified that the mental health records showed that Smith had a history of going off and then back on his mental health medication.

Saylor testified that the records contained a November 8, 2012, note from QMHP Jones. Saylor stated that the note reflected that Jones spoke to Smith in

cell D-402 while Smith was in restraints. Jones noted that Smith said he wanted to kill himself. Jones noted that Smith was angry and suicidal. According to the records, Jones wrote orders to place Smith on a modified strip cell status in a safety smock with officers checking on him every 15 minutes.

The records reflect that Jones evaluated Smith again on November 9, 2012, while he was still in five-point restraints. Jones noted that Smith said that he would kill himself because he could not get out of five-point restraints. Jones noted that Smith was a very angry and impulsive person. Salyor said the record made no mention of any report of a physical or sexual assault.

At 1:35 p.m. that same day, Jones noted that Smith told him that he feared for his life because officers had beaten him and stuck a finger up his anus, according to Salyor. Jones noted that Smith complained of another sexual assault eight days earlier. Jones also noted that Smith was at risk of self harm and noted that he needed to have a Prison Rape Elimination Act assessment.

Salyor testified that the record also contained a December 14, 2012, note from Jones saying that he had spoken to Smith at the door of his cell. Jones noted that Smith was complaining because officers had not given him his meal tray. Jones also noted that Smith was refusing his medication because he was scared the nurse would give him something to kill him. Jones noted that Smith began to cry and was anxious with no indication of psychosis.

Subsequent to trial, Smith filed a letter along with several other documents, which have been reviewed and considered by the court. (Docket Item Nos. 55, 57.)

Most of these documents are irrelevant to the claim before the court. Some of the documents, however, show that Smith did file a Grievance against Gilliam on October 31, 2012, alleging that she had given his medications to another inmate. (Docket Item No. 55 at 35-40.)

*II. Analysis*

The Eighth Amendment to the U.S. Constitution not only prohibits excessive sentences, but it also protects prison inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years. *See Hudson v. McMillian,* 503 U.S. 1, 5 (1992); *Whitley v. Albers,* 475 U.S. 312, 319 (1986). The Eighth Amendment also requires prison officials to take reasonable measures to guarantee the safety of inmates. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994*); Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984).

The determination of whether the use of force by a prison official violates the Eighth Amendment includes both a subjective and objective component. *See Williams,* 77 F.3d at 761 (citing *Wilson v. Seiter,* 501 U.S. 294, 302 (1991)). Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. *See Hudson,* 503 U.S. at 9 (citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973)). To meet the objective component in an excessive force case, an inmate must show that the force used was "nontrivial," *Wilkins v. Gaddy*,

559 U.S. 34, 39 (2010), given that "contemporary standards of decency always are violated… whether or not significant injury is evident." *Hudson,* 503 U.S. at 9. "This is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." *Wilkins,* 559 U.S. at 37 (quoting *Hudson,* 503 U.S. at 7). In fact, the extent of the injury may suggest that "'the use of force could plausibly have been thought necessary' in a particular situation" or "provide some indication of the amount of force applied." *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 7). For example, "[a]n inmate who complains of a [mere] 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins,* 559 U.S. at 37 (quoting *Johnson*, 481 F.2d at 1033). As *Wilkins* clarified, it is the nature of the force "that ultimately counts" and provides the "core judicial inquiry" in an excessive force case. 559 U.S. at 37, 38. In particular, courts must consider "whether [the force] was nontrivial and 'was applied…maliciously and sadistically to cause harm.'" *Wilkins*, 559 U.S. at 39 (quoting *Hudson*, 503 U.S. at 7).

To meet the subjective component in an excessive force case, the inmate must show that the prison official applied force "maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 320-21. The inquiry under the subjective standard is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. The Supreme Court in *Whitley* set out several factors which should be considered in determining whether prison officials acted maliciously and sadistically. In particular, the court should consider:

1) The need for application of force;

2) The relationship between that need and the amount of force used;

3) The threat "reasonably perceived by the responsible officials," and

4) "any efforts made to temper the severity of a forceful response."

*Williams,* 77 F.3d at 762 (citing *Whitley,* 475 U.S. at 321).

The outcome of this case turns on the court resolving the disputed facts surrounding the events of November 8, 2012. If the court were to find Smith's version of the events credible, there would be sufficient evidence to find that Smith had proven both the objective and subjective components of his excessive force claim. If the court were to find the defendants' version of the events credible, no physical or sexual assault occurred, and the amount of force used was justified based on Smith's actions and was not excessive under the circumstances. Based the evidence presented at the September 19 hearing I find the defendants' testimony the more credible, and I will recommend that the court enter judgment in their favor.

Based on the defendants' testimony, I find that Smith spit on Owens after being escorted into the D Building vestibule. I find that Owens and Carico used that amount of force necessary to take Smith to the floor and control him until Officers Dixon and Kimberlin responded and relieved them. Perhaps the most persuasive piece of evidence presented in this case was the video evidence of Owens and Carico escorting Smith into the D Building vestibule. While the video does not conclusively prove that no assault occurred, it does show that the entire incident from the officers taking Smith to the floor to standing him back up occurred in less than three minutes – an extremely short period of time for the officers to have punched Smith repeatedly in the head, slammed his head against

the floor repeatedly, kicked him in the groin, sexually assaulted him and then repeatedly kicked him in the head.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. The force applied to Smith by Owens and Carico on November 8, 2012, was justified by Smith's actions and was not excessive under the circumstances; and

2. Smith has failed to meet his burden of proof to show that Owens, Carico and Dixon violated his Eighth Amendment right to be free from cruel and unusual punishment by using excessive force on him on November 8, 2012.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court enter judgment in favor of the defendants.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written

objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Samuel G. Wilson, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: This 12th day of November, 2013.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE